UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| IN THE MATTER OF TWO-J RANCH, INC. and VIDALIA DOCK & STORAGE COMPANY, AS OWNER AND BAREBOAT CHARTERER OF M/V CARLA J, PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION NO. 04-1891-A (LEAD) JUDGE DRELL MAGISTRATE JUDGE KIRK |

*CONSOLIDATED WITH*

| | |
|---|---|
| IN THE MATTER OF LUHR BROS., INC. AS CHARTERER AND OWNER <u>PRO HAC VICE</u> OF BARGE GD-941, PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION NO. 04-2457-A (MEMBER) JUDGE DRELL MAGISTRATE JUDGE KIRK |

<u>R U L I N G</u>

Before the Court are three reports and recommendations (Docs. 137, 138, and 139) concerning three separate motions for summary judgment, filed by Luhr Bros., Inc. (Doc. 68); Tower Rock Stone Co. (Doc. 103); and Two-J Ranch, Inc. and Vidalia Dock & Storage Company (Doc. 106).  Also before us are two motions filed by Carol E. King—a motion to dismiss cross-claims (Doc. 72) and a renewed motion to lift stay and to remand (Doc. 74).  Because all of the motions rest on the same set of facts, we determine them at the same time.

After an independent review of the record, including the written objections submitted by all claimants, and concurring in part with the magistrate judge's findings under the applicable law, we adopt the reports and recommendations in part, subject to certain significant modifications set out below.  In short, we grant in part and deny

in part each of the motions for summary judgment (Docs. 68, 103, and 106); deny the motion to dismiss cross-claims filed by Carol E. King (Doc. 72); and deny the renewed motion to lift stay and to remand filed by Ms. King (Doc. 74).

## I. BACKGROUND

The basic facts are not in dispute.  The consolidated suits before us arise from the drowning death of James King, an employee of Vidalia Dock & Storage Company ("VD&S"), on November 7, 2001.  While working as an assistant deckhand aboard a VD&S towboat, King boarded a barge in tow, slipped from the edge, and fell into the Mississippi River.  Rescue operations were unsuccessful.  From this accident arose a state court suit by King's widow, Carol E. King, which suit was stayed following the filing of two limitation of liability suits in this Court, now consolidated.  That is the general outline, but the particulars get somewhat more complicated.

Sometime before the accident in question, Terral RiverService, Inc. ("Terral") (a non-party) ordered a powdered limestone substance called AgLime from Tower Rock Stone Co. ("Tower Rock"), to be delivered to the dock facilities of VD&S in Vidalia, Louisiana via the Mississippi River.  On November 1, 2001, Tower Rock loaded a barge identified as GD941 with AgLime at Tower Rock's Missouri facility.  The barge was loaded in such a way that, while the bow and stern had some free space, the mound of AgLime covered the rest of the barge from port to starboard, spilling over a short barrier onto the narrow starboard lip of the barge.

Luhr Bros., Inc. ("Luhr") was the charterer and owner pro hac vice of barge GD941 and the operator of the M/V Alois Luhr, a towboat.  The M/V Alois Luhr towed GD941

2

from Missouri to Louisiana. On November 6, 2001, GD941 was transferred mid-river from the M/V Alois Luhr to the M/V Bettye M. Jenkins, a towboat operated by VD&S, at which point the M/V Alois Luhr departed. The M/V Bettye M. Jenkins towed GD941 closer to VD&S's facility, but the actual docking operation was to be aided by another towboat operated by VD&S, the M/V Carla J.

James King was employed as an assistant deckhand aboard the M/V Carla J, but that was a relatively new title for him. King commenced employment with VD&S in May 2001, working as a welder for the drydock operation, which included a drydock and an attached spud barge floating in the Mississippi River. In addition to the drydock operation, VD&S operated a small group of towboats. VD&S operated in conjunction with a sister company, Two-J Ranch, Inc. ("Two-J"), which operated a rock yard adjacent to the VD&S operations.[1] Two-J actually owned the M/V Carla J, and VD&S bareboat chartered it for its operations. As a consequence, VD&S supplied the crew for the towboat and was owner pro hac vice. VD&S made a practice of drawing on its pool of drydock employees to fill its towboat crews on a temporary basis, and King apparently took advantage of that opportunity from time to time, though the frequency and length of that temporary work is disputed.

What is not disputed is that in September 2001, King officially started working as an assistant deckhand for VD&S. As a result, he was aboard the M/V Carla J on November 7, 2001 as it brought in barge GD941. At some point, he stepped out onto GD941 and attempted to walk along the narrow starboard lip of the barge,

---

[1] Two-J and VD&S are separate Mississippi corporations evidently controlled by the same family, the Jenkinses, and the companies' operations are to some extent related.

3

approximately 12 inches wide.  On the barge side of the lip was a 24 inch high wall, but there was no boundary, rail, or wall on the river side to prevent a fall.  Unfortunately, King slipped into the water and could not be rescued.

King's widow, Carol E. King, filed a wrongful death suit in the Seventh Judicial District Court of the State of Louisiana on June 22, 2004 against VD&S alone, alleging negligence under the Jones Act, 46 U.S.C. § 688 et seq., and general maritime law.  On September 10, 2004, Two-J and VD&S, as owner and owner pro hac vice of the M/V Carla J, filed a complaint for exoneration from or limitation of liability in this Court under admiralty and maritime jurisdiction and under the Limitation of Liability Act, 46 U.S.C. § 181 et seq.  The stipulated value of the M/V Carla J and her pending freight is $35,000.  On October 13, 2004, King filed an amended complaint in the state court action, adding Luhr, alleging that Luhr negligently loaded barge GD941 and allowed the dangerous condition to remain.  On December 3, 2004, Luhr filed a limitation of liability suit in this Court as owner pro hac vice of barge GD941, with the value of the barge and her pending freight stipulated at $182,500.

We stayed the state court proceedings and consolidated these two limitation of liability suits.[2]  The claimants, and their digested claims, are as follows:

(a)  **Carol E. King** alleges that James King was a Jones Act seaman and that,"[t]hrough no fault of his own, he was killed (i) the negligence of Vidalia Dock and Two-J Ranch (ii) by reason of their failure to provide him a safe place to work (iii) by the totally inadequate and negligent failure of the defendants to rescue him once he was in peril and (iii) [sic] by the unseaworthiness of the Carla J and her tow." (Doc. 10, p. 4).  In the Luhr claim, Ms. King claims that James King's death was "due to, among other

---

[2]  The lead case is 04-1891, while the member case is 04-2457. Unless otherwise noted, citations to the record are to documents from the lead case.

4

reasons, extra-ordinarily large and out-of-hopper accumulations of lime on her walkways which made walking extra-hazardous" and that barge GD941 "was loaded with the lime by Luhr Bros which, abandoning good practice and all caution, left her in that condition at the completion of loading." (Member, Doc. 10, pp. 5-6).

(b)     **Luhr** essentially alleges that if anyone is responsible, it is the decedent and/or others, but not Luhr.  Moreover, Luhr alleges that if Two-J and VD&S are responsible, they are not entitled to limitation of liability because any unseaworthy condition was within their privity or knowledge. (Doc. 11).  Luhr further prays for indemnity and/or contribution from Two-J and VD&S.

(c)     **Two-J and VD&S** allege basically the same things with respect to Luhr. The two companies also request indemnity and/or contribution from Luhr. (Doc. 20).  These claims by Luhr against Two-J and VD&S and vice versa are the subject of Ms. King's motion to dismiss cross-claims (Doc. 72).

(d)     **Louisiana Workers' Compensation Corporation** ("LWCC") alleges that James King's death was caused by the negligence of Two-J, Luhr, and/or non-parties to this proceeding; by the gross negligence of the operator of the M/V Carla J and barge GD941; and by the unseaworthiness of those vessels. (Docs. 22 and 24).  LWCC seeks "$52,321.57 plus all additional amounts paid to or on behalf of James King and/or his spouse, Carol E. King, pursuant to their claims for workers' compensation benefits." (Doc. 23, p. 1).[3]

In addition, Two-J/VD&S filed a third party complaint against Tower Rock on September 21, 2005 pursuant to Fed. R. Civ. P. 14(a) and 14(c), seeking to make Tower Rock fully or proportionally liable in the event of a judgment against Two-J/VD&S and seeking to tender Tower Rock to King as a direct defendant.  Tower Rock responded, inter alia, by pleading the affirmative defense that King's claims are time-barred and that King's death was caused solely by his own negligence and that of others.

---

[3]  According to LWCC's claim, these benefits were paid pursuant to the Longshore and Harbor Workers Compensation Act.  (Doc. 23, p. 2; Doc. 25, p. 2).

On August 8, 2005, Carol E. King filed a motion to lift stay and to remand (Doc. 36), agreeing that this Court has exclusive jurisdiction over the limitation of liability proceedings and assuring the Court that, if we were to lift the stay of the state court wrongful death action, she would not seek to enforce a greater damage award than the amount represented by the stipulations of value in the limitation of liability suits. On March 29, 2006, we denied the motion, because King's proposed stipulations did not cover all potential claimants in the matter and because the stipulations did not adequately protect the shipowners' rights to limit liability. In particular, neither Luhr nor Two-J/VD&S signed the stipulations, and those parties also had (and have, in light of our ruling today) claims against one another.

On September 20, 2006, Luhr filed a motion for summary judgment (Doc. 68) seeking dismissal of all claims against it. On October 11, 2006, King filed a motion to dismiss the cross-claims between Luhr and Two-J/VD&S (Doc. 72) and a renewed motion to lift the stay and to remand to the state court (Doc. 74). On June 19, 2007, Tower Rock filed a motion for summary judgment (Doc. 103), and on June 20, 2007, Two-J and VD&S filed their own motion for summary judgment (Doc. 106), each seeking dismissal of the claims against it. That flurry of activity brings us to this decision, where we decide all of these motions simultaneously.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure states provides summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials
> on file, and any affidavits show that there is no genuine issue as to any

6

material fact and that the movant is entitled to judgment as a matter of law.

Id. A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2510-11 (1986). If the movant produces evidence tending to show there is no genuine issue of material fact, the nonmovant must then direct the Court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 321-23, 106 S. Ct. 2548, 2552 (1986)). In the analysis, all inferences are drawn in the light most favorable to the nonmovant. Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment. Brock v. Chevron U.S.A., Inc., 976 F.2d 969, 970 (5th Cir. 1992).

### III. SEAMAN STATUS

Because James King's death occurred in connection with his maritime employment, the threshold issue in this case is his status at the time of death. Depending on whether or not King was a seaman, one of two mutually exclusive statutory schemes applies in this case—the Jones Act, 46 U.S.C.App. § 30104(a), or the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 et seq. Swanson v. Marra Bros., 328 U.S. 1, 7-8 (1946); McDermott Intern., Inc. v. Wilander, 498 U.S. 337, 347 (1991) (citing Swanson). "The Jones Act provides tort remedies to sea-based maritime workers, while the LHWCA provides workers' compensation to land-

7

based maritime employees."   <u>Stewart v. Dutra Const. Co.</u>, 543 U.S. 481, 488 (2005) (emphasis in original).   These two statutes are related in an important way: As the Supreme Court noted regarding seaman status, "it is odd but true that the key requirement for Jones Act coverage now appears in another statute"—the LHWCA. <u>Wilander</u>, 498 U.S. at 347.  Because everything in this case turns on whether or not King was a seaman, that status must be our first inquiry.

### A. Vessel or Fleet?

Seaman status is established by "the relationship a worker must have to a vessel in order to be a 'master or member' of its crew" under the language of the LHWCA. <u>Stewart</u>, 543 U.S. at 488 (<u>citing</u> <u>Wilander</u> and <u>Chandris, Inc. v. Latsis</u>, 515 U.S. 347 (1995)).   Because this formulation necessarily involves a determination of what a "vessel" is, we will first determine what vessel or vessels exist under these facts before turning to the relationship that King had to any vessel or group of vessels.

In <u>Stewart</u>, 543 U.S. at 488-92, the Supreme Court held that the term "vessel" under the LHWCA (and thus the Jones Act) is defined in the Rules of Construction Act, 1 U.S.C. § 3, as follows:  "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."   <u>Id.</u>  The Fifth Circuit has noted that <u>Stewart</u> represents a "significant broadening of the set of unconventional watercraft that must be deemed vessels." <u>Holmes v. Atlantic Sounding Co., Inc.</u>, 437 F.3d 441, 448 (5th Cir. 2006).

The phrase "used, or capable of being used, as a means of transportation on water" seems to be the key distinction in the newly broad definition of "vessel."  The

8

Supreme Court emphasized that the language "does not require that a watercraft be used underlined primarily for that purpose." Stewart, 543 U.S. at 495 (emphasis in original). "The question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one. In some cases that inquiry may involve factual issues for the jury . . ., but here no relevant facts were in dispute." Id. at 496.  That is also the case here, as we discuss below.

In Stewart, the Supreme Court held that the Super Scoop, "a massive floating platform from which a clamshell bucket is suspended beneath the water," was a vessel. Id. at 484.  It further described the vessel as follows:

> The bucket removes silt from the ocean floor and dumps the sediment onto one of two scows that float alongside the dredge. The Super Scoop has certain characteristics common to seagoing vessels, such as a captain and crew, navigational lights, ballast tanks, and a crew dining area. But it lacks others. Most conspicuously, the Super Scoop has only limited means of self-propulsion. It is moved long distances by tugboat.  (To work on the Big Dig, it was towed from its home base in California through the Panama Canal and up the eastern seaboard to Boston Harbor.)  It navigates short distances by manipulating its anchors and cables. When dredging the Boston Harbor trench, it typically moved in this way once every couple of hours, covering a distance of 30-to-50 feet each time.

Id. at 484-85.

Although the Court conceded "the seeming incongruity of grouping dredges alongside more traditional seafaring vessels under the maritime statutes," it reiterated that "Congress and the courts have long done precisely that." Id. at 497.  Important to its determination was the fact that "the Super Scoop was engaged in maritime transportation" when the cause of action arose, Id., and that it "had not been taken out of service, permanently anchored, or otherwise rendered practically incapable of

maritime transport." Id. at 496.  Thus, it fit the broad definition of "vessel" in 1 U.S.C.

§ 3, as applied to the Jones Act and LHWCA.

In Holmes v. Atlantic Sounding Co., Inc., 437 F.3d 441 (5th Cir. 2006), the Fifth

Circuit applied Stewart's broad definition of "vessel" to the BT-213, which the Court

described as follows:

> The BT-213 is 140 feet long and 40 feet wide.  It is, in effect, a floating dormitory, a barge on the deck of which a two-story, 50-bed "quarters package" is mounted.  Weeks causes the BT-213 to be moved from place to place to house and feed employees during dredging projects at various locations.  The BT-213 has sleeping quarters on both stories, as well as toilet facilities, a fully-equipped galley, locker rooms, freshwater deck tanks, diesel-powered electrical generators, and a gangway with railings.  The BT-213's entire "crew" consists of two cooks and two janitors.  There is no record evidence that they are transported on the BT-213 while it is moved from one site to another.
>
> The BT-213 is towed by tugs between project locations.  It is sometimes towed by itself and, at times, together with other barges.  Weeks temporarily installs battery-operated running lights on the BT-213 when it is to be towed by itself.  When the BT-213 is not in use, it is held in a boat slip . . . .
>
> The BT-213 has never been inspected by or registered with the Coast Guard.  It is not intended to transport personnel, equipment, passengers, or cargo, and no evidence in the record reflects that it has ever done so.  It is not fitted out with winches, running lights, a radar, a compass, engines, navigational aids, Global Positioning System, lifeboats, or steering equipment such as rudders.  It is incapable of self-propulsion; has no captain, engineer, or deckhand; has no bilge pumps or wing tanks; and has never been offshore.
>
> On the other hand, the BT-213 has a raked bow on each end, and "two end tanks where the rakes are ... for flotation."  It has a radio that is used primarily to communicate with the dredge.  It is equipped with bits or bollards that are used to tie it to the shore or to other vessels or structures.  It is sometimes moored by anchors and is equipped with life rings and portable water pumps.

Id. at 443-44.

10

The Fifth Circuit reasoned:

Consistent with <u>Stewart</u>'s expanded definition of that term ["vessel], we
have no trouble concluding that the BT-213 is a vessel.

In addition to personnel and cargo, e.g., supplies incidental to room and
board, the BT-213 is 'practically capable' of transporting equipment. . . .

In addition, the BT-213 possesses a number of the objective characteristics
of a vessel.  As stated above, it has a raked bow and 'two end tanks where
the rakes are . . . for flotation.'   The BT-213 is fitted out with vessel-like
gear (such as traditional mooring devices, bits or bollards or cleats) for
securing it to the shore or to other vessels by lines or hausers.   It is
generally moored with anchors as well as land lines; and on some projects,
it is moored in navigable waters, completely inaccessible from the shore
except by boat.   We also note that when the BT-213 is moored near a
dredge site, its mooring is temporary only, which distinguishes it to some
extent from the quarterbarge in [<u>Gremillion v. Gulf Coast Catering Co.</u>, 904
F.2d 290, 291 (5th Cir.1990)], which 'was **partially sunk into a shoreside
mudbank**,' and from the faux paddle-wheel gaming boat in [<u>Pavone v.
Miss. Riverboat Amusement Corp.</u>, 52 F.3d 560 (5th Cir.1995)], which was
**moored to the shore permanently**, save only in the event of a hurricane.

<u>Id.</u> at 448-49 (footnote omitted) (emphasis added).

  <u>Stewart</u> and <u>Holmes</u> give a fair indication of the broad sweep of the term "vessel."

With those cases in mind, we turn to the facility on which James King spent a great deal

of time—VD&S's drydock.   Prior to <u>Stewart</u>, the Fifth Circuit, "while unwilling to

promulgate an absolute rule of law that a floating dry dock can never be a vessel, . . .

clearly embraced the proposition that, as a matter of law, a floating dry dock is not a

vessel when it is moored and in use as a dry dock."  <u>Keller v. Dravo Corp.</u>, 441 F.2d 1239,

1244 (5th Cir. 1971).  We must now determine whether that rule of law remains viable

post-<u>Stewart</u>.

Although neither <u>Stewart</u> nor <u>Holmes</u> directly concerned a drydock, the <u>Stewart</u> Court discussed an earlier drydock case, <u>Cope v. Vallette Dry-Dock Co.</u>, 119 U.S. 625 (1887), in which the Supreme Court held that the drydock in question was not a vessel. <u>Id.</u> at 627-28.  The <u>Stewart</u> Court agreed that <u>Cope</u> would govern even under the broad definition of "vessel" in 1 U.S.C. § 3:

> In <u>Cope</u>, the plaintiff sought a salvage award for having prevented a drydock from sinking after a steamship collided with it.  119 U.S., at 625-626, 7 S.Ct. 336.  At the time of the accident, the drydock, a floating dock used for repairing vessels, was "moored and lying at [the] usual place" it had occupied for the past 20 years.  <u>Id.</u>, at 626, 7 S.Ct. 336.  In those circumstances, the drydock was a "fixed structure" that had been "permanently moored," rather than a vessel that had been temporarily anchored.  <u>Id.</u>, at 627, 7 S.Ct. 336. . . .
>
> <u>Cope</u> . . . did no more than construe § 3 in light of the distinction drawn by the general maritime law between watercraft temporarily stationed in a particular location and those permanently affixed to shore or resting on the ocean floor.  <u>See, e.g.</u>, <u>The Alabama</u>, 19 F., at 546 (noting that vessels possess "mobility and [the] capacity to navigate," as distinct from fixed structures like wharves, drydocks, and bridges).  Simply put, a watercraft is not "capable of being used" for maritime transport in any meaningful sense if it has been **permanently moored or otherwise rendered practically incapable of transportation or movement**.

<u>Stewart</u>, 543 U.S. at 493-94 (emphasis added).  Thus, the Court emphasized, the § 3 definition alone controls, and it is necessarily a fact-intensive inquiry.  As noted above, however, if the relevant facts are undisputed, the determination may be made as a matter of law.

In this case, the relevant facts are not disputed with respect to the status of the drydock and the associated spud barge.  About once a year, depending on the river level, the drydock and spud barge would be moved up and down the river bank as much as several hundred feet along the property line of VD&S and Two-J.  Far more frequently,

the drydock and spud barge would be moved a short distance toward and away from the river bank. This movement shows that not only were the drydock and spud barge capable of being used for maritime transport, they actually were used for that purpose. That in itself is sufficient to place the watercraft within the definition of "vessel" in 1 U.S.C. § 3 for purposes of Jones Act and LHWCA analysis. As Stewart and Holmes reveal, even structures that lack many traditional characteristics of vessels are now vessels under 1 U.S.C. § 3, provided they are not "permanently moored."

To drive the point completely home, we emphasize that the drydock in this case is unlike the drydock in Cope. In Cope, the drydock "had been put in position by being permanently moored by means of large chains" to the river bank, and the drydock's only movement occurred in place, closer or further from the riverbed by means of pumps. Cope, 119 U.S. at 627. Clearly, the drydock here does not fit that description.

Obviously, by making this determination, we decline to adopt that portion of the magistrate judge's report and recommendation (Doc. 139) which asserts that there is insufficient evidence as to whether the drydock and/or spud barge are vessels. The fact that the report and recommendation speaks of the fact of movement of "a couple of feet in to the bank or a couple of hundred feet up or down the river" (Doc. 139, p. 10), is sufficient under Stewart to give rise to vessel status. Some mere "connection" to the bank is insufficient, absent a permanent mooring, to preclude vessel status.

In their objections to the magistrate judge's report and recommendation on their motion for summary judgment, claimants Two-J and VD&S strenuously argue against the classification of the drydock and spud barge as vessels. Stripped down to its

13

essence, their argument is that movement over relatively short distances due to changes in the river level is not the same as movement over great distances or movement "across a river for different projects or for customers' needs." (Doc. 148, p. 3). They argue that "the dry dock and spud barge are not moved whatsoever but for tidal changes. Tidal changes should not and must not eviscerate the status of the structures as those providing long standing vessel repairs as opposed to vessel operations for transportation means." (Id.).

In other words, Two-J and VD&S would have us look at the purpose of the watercraft and the reasons **why** they were used in maritime transportation in order to exempt it from Stewart's definition of "vessel." This we cannot do. Under 1 U.S.C. § 3, "[t]he word 'vessel' includes every description of watercraft or other artificial contrivance **used, or capable of being used, as a means of transportation on water**." Thus we must find as a matter of law, based on the undisputed material facts, that the drydock and spud barge in this case are vessels for purposes of Jones Act and LHWCA analysis.

## B.  Relationship to a Vessel or Fleet?

As we previewed above, the presence of a vessel is only part of the analysis for seaman status. Following Stewart's broadening of the definition of "vessel," the Fifth Circuit reiterated, "A maritime worker seeking Jones Act seaman status must also prove that his duties contributed to the vessel's function or mission, and that his connection to the vessel was substantial both in nature and duration." Holmes, 437 F.3d at 448. Although we have determined that VD&S's drydock and spud barge are vessels, we

must determine the consequences of that classification by assessing King's relationship with the vessels in question.

The Supreme Court fleshed out what it takes to be a seaman in a pair of cases: McDermott Intern., Inc. v. Wilander, 498 U.S. 337 (1991) and Chandris, Inc. v. Latsis, 515 U.S. 347 (1995). Chandris, the more recent case, contains the more complete statement of the law:

> [W]e think that the essential requirements for seaman status are twofold. **First, as we emphasized in Wilander, "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'"** 498 U.S., at 355, 111 S.Ct., at 817 (quoting Robison, 266 F.2d, at 779). The Jones Act's protections, like the other admiralty protections for seamen, only extend to those maritime employees who do the ship's work. But this threshold requirement is very broad: "All who work at sea in the service of a ship" are eligible for seaman status. 498 U.S., at 354, 111 S.Ct., at 817.
>
> **Second, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.** The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea. See 1B A. Jenner, Benedict on Admiralty § 11a, pp. 2-10.1 to 2-11 (7th ed. 1994) ("If it can be shown that the employee performed a significant part of his work on board the vessel on which he was injured, with at least some degree of regularity and continuity, the test for seaman status will be satisfied" (footnote omitted)). This requirement therefore determines which maritime employees in Wilander's broad category of persons eligible for seaman status because they are "doing the ship's work," 498 U.S., at 355, 111 S.Ct., at 817, are in fact entitled to the benefits conferred upon seamen by the Jones Act because they have the requisite employment-related connection to a vessel in navigation.
>
> It is important to recall that the question of who is a "member of a crew," and therefore who is a "seaman," is a mixed question of law and fact.

> Because statutory terms are at issue, their interpretation is a question of law and it is the court's duty to define the appropriate standard. <u>Wilander</u>, 498 U.S., at 356, 111 S.Ct., at 818. On the other hand, "[i]f reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the jury." <u>Ibid.</u>

<u>Chandris</u>, 515 U.S. at 368-69 (emphasis added).  We must now determine, under these standards, whether King was a seaman.

### 1. Vessel or Fleet of Vessels

The Supreme Court clarified in <u>Stewart</u> that it "did not mean that the 'in navigation' requirement stood apart from [1 U.S.C.] § 3, such that a 'vessel' for purposes of § 3 might nevertheless not be a 'vessel in navigation' for purposes of the Jones Act or the LHWCA." <u>Stewart</u>, 543 U.S. at 496.  Thus, a vessel under 1 U.S.C. § 3, like the drydock or spud barge here, is automatically a "vessel in navigation" for purposes of <u>Chandris</u> analysis.

In this case, <u>all</u> of the watercraft in question—the drydock, the spud barge, and the towboats, including the M/V Carla J—are vessels under 1 U.S.C. § 3.  Thus, all of the vessels are "in navigation" under the second prong of <u>Chandris</u>.  Moreover, because VD&S controls all of the vessels in question, they constitute an "identifiable fleet" under <u>Chandris</u>, as they are "a finite group of vessels under common ownership or control." <u>Chandris</u>, 515 U.S. at 366 (<u>citing</u> <u>Braniff v. Jackson Avenue-Gretna Ferry</u>, Inc., 280 F.2d 523, 528 (5th Cir. 1960)).  Thus, Mr. King's seaman status may be determined with respect to either each individual VD&S vessel or to the VD&S fleet as a whole.

16

### 2. Contribution to Function or Mission

The first prong of <u>Chandris</u> analysis is easily met.  For each individual vessel, Mr. King contributed to its primary function.  He was a welder aboard the drydock and spud barge, the purpose of which duo was to aid in repairing other vessels.  As such, his job was essential to the fulfillment of those vessels' function.  (Indeed, the spud barge appears to be little more than a welding work area.)  In his work as an assistant deckhand aboard VD&S towboats, his work was likewise essential to the function of those vessels, as a towboat cannot very well work without crew members.  More broadly, with respect to the VD&S fleet, the function or mission was to aid in VD&S operations, and it would be absurd to suggest that Mr. King's duties did not contribute to that function or mission.

### 3. Substantial Connection

The second prong of <u>Chandris</u> analysis requires that Mr. King "have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature," a major purpose of which is "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and whose employment does not regularly expose them to the perils of the sea."  <u>Chandris</u>, 515 U.S. at 368.

As noted above, the drydock, the spud barge, and all of the towboats are vessels in navigation for purposes of this analysis.  The record indisputably shows that Mr. King spent all or virtually all of his time on these vessels in furtherance of their essential

functions. Consequently, he clearly has a substantial connection to the VD&S fleet, in terms of both the duration (virtually 100% of his time) and the nature of his work. Thus, it seems clear, based on the uncontroverted facts of his employment and on the classification as vessels of the drydock and spud barge, that Mr. King was a seaman on November 7, 2001 at the time of the accident.[4]

Although, as the <u>Chandris</u> court stated, seaman status is a mixed question of law and fact, the <u>Wilander</u> court reasoned, "Nonetheless, summary judgment . . . is mandated where the facts and the law will reasonably support only one conclusion." <u>Wilander</u>, 498 U.S. at 356. The relevant facts here are undisputed, and under the circumstances, they lead to only one conclusion. Thus, we may—indeed, must—find that James King was a seaman under the Jones Act, 46 U.S.C.App. 30104(a).

## IV. GENERAL CONSEQUENCES OF SEAMAN STATUS

Because we find that Mr. King is a seaman, claimant Carol E. King, Mr. King's widow, is fully entitled to the benefits and protections of the Jones Act, 46 U.S.C.App. § 10304(a):

> **(a) Cause of action.**--A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

---

[4] To be absolutely clear, we base our holding on the fact that Mr. King spent all or virtually all of his time on vessels in furtherance of their work, not on the fact that he was classified as an assistant deckhand at the time of death. Had he suffered the same fate while employed solely as a welder on the drydock and spud barge, our holding would be the same under the facts of this case, given the particular nature of this drydock. Consequently, we need not and do not address sharply disputed facts of Mr. King's employment raised by Two-J/VD&S, such as the amount of time actually spent on towboats relative to the amount of time spent on the drydock and spud barge. Those disputed facts simply are not relevant to our decision today.

Id. Thus, Ms. King clearly may bring a civil action against VD&S, James King's employer, under the express terms of the Jones Act. Outside of that action, things get somewhat trickier.

We find Smith v. Harbor Towing & Fleeting, Inc., 910 F.2d 312 (5th Cir. 1990), to be on point and controlling. In Smith, the claimant was a Jones Act seaman with respect to his employer's tug, the M/V TODD G. After being injured aboard a barge owned by a third party, Chotin, being towed by the M/V TODD G, he brought a Jones Act civil action against his employer; a general maritime action against his employer; a general maritime action against Chotin; and an unseaworthiness claim against Chotin. Id. at 312-13. The Fifth Circuit, affirming the district court, held that because the claimant was not a crew member of Chotin's barge, he could not bring an unseaworthiness claim. Id. at 312. The Fifth Circuit explained that the claimant

> has a variety of possible remedies as a Jones Act seaman: maintenance and cure and a Jones Act negligence claim against his employer as employer, an unseaworthiness claim against his employer as vessel owner for any injury on the M/V TODD G, and a negligence claim in maritime tort for Chotin's breach of duty of reasonable care under the circumstances. Thus, there is no need for him to join the pocket of Sieracki seamen.

Id. at 314-15.[5]

This case involves a wrongful death claim rather than a mere injury claim, but the result is similar. Under the Jones Act, Carol E. King may bring a civil action against VD&S, Mr. King's employer, including a negligence claim, a general maritime claim, and an unseaworthiness claim for any injury on a VD&S vessel. Ms. King may also bring a

---

[5] In the Fifth Circuit, at least, Sieracki seaman status, which is beyond the scope of this opinion, has not entirely disappeared. Smith, 910 F.2d at 313-14 (citing Aparicio v. Swan Lake, 643 F.2d 1109 (5th Cir. 1981)).

general maritime negligence action against any and all third parties, including Luhr, the owner of barge GD941, from which Mr. King fell.  However, under the rule of Smith, Ms. King may not bring an unseaworthiness action against Luhr for the unseaworthiness of barge GD941.  We discuss the consequences of this general outline in detail below in regard to specific motions.

Because the general maritime negligence actions and Jones Act negligence action involve some of the same issues, we will address them at this stage.  First, nonpecuniary damages are not allowed in either a Jones Act negligence claim, a general maritime claim, or an unseaworthiness claim.  Miles v. Apex Marine Corp., 498 U.S. 19-20 (1990); Guevara v. Maritime Overseas Corp., 34 F.3d 1279 (5th Cir. 1994); In re American River Transp. Co., 490 F.3d 351, 353-56 (2007) (discussing evolution of maritime wrongful death action and limitation to pecuniary damages).  Thus, regardless of what specific claims Ms. King may bring against VD&S and third parties, she will be barred from seeking nonpecuniary damages like punitive damages and loss of society.

Second, we note that we cannot grant judgment as a matter of law in this case on any of the negligence claims because of the presence of genuine issues of material fact.  A general maritime negligence claim involves a traditional, broad formulation of the tort inquiry: "under the negligence concept, there is only a duty to use due care, i.e., reasonable prudence . . . .  Defects which would not have been known to a reasonably prudent person at the outset, or arose after use and which a reasonably prudent person ought not to have discovered would impose no liability."  Cox v. Esso Shipping Co., 247 F.2d 629, 637 (5th Cir. 1957).

Under the Jones Act and the Federal Employers' Liability Act ("FELA") (incorporated by reference in the Jones Act), the standard is still ordinary care. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 338 (5th Cir. 1997). In Gautreaux, the Fifth Circuit quoted with approval a Third Circuit opinion:

> By its very terms, the FELA provides that "the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." 45 U.S.C. § 53. The statute does not distinguish between degrees of negligence; the statute does not say that the plaintiff only has a slight duty of care. Under the statute, a plaintiff's recovery is reduced to the extent that he is negligent and that such negligence is responsible for the injury. In such a situation, one must assume that Congress intended its words to mean what they ordinarily are taken to mean—a person is negligent if he or she fails to act as an ordinarily prudent person would act in similar circumstances. Such a reading also is in accord with the FELA's pure comparative negligence scheme; and to adopt [plaintiff's] argument would be to abandon the clear dictate of the statute in favor of a policy decision to favor employees over employers.

Id. (quoting Fashauer v. New Jersey Transit Rail Operations, Inc., 57 F.3d 1269, 1283 (3d Cir. 1995)).[6]

The above passage also indicates another important point: Comparative negligence applies in Jones Act cases under FELA's contributory negligence provision,

---

[6] The FELA contributory negligence statute referenced in Fashauer, 45 U.S.C. § 53, reads in full:

> In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, **the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee**: Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

Id. (emphasis added).

21

45 U.S.C. § 53. Comparative fault also applies to general maritime claims, such as negligence and unseaworthiness. Pope & Talbot v. Hawn, 346 U.S. 406, 408-09 (1953). Thus, for summary judgment purposes, the Jones Act negligence claim and general maritime negligence claims are subject to the same analysis.

In this case, the fact that contributory negligence does not bar recovery requires that we deny summary judgment. Genuine issues of material fact remain, inter alia, as to any safety training that VD&S either provided or failed to provide James King; whether there was a previous accident, close in time, involving another employee under substantially the same circumstances which Mr. King witnessed; whether there was a safety meeting following that accident in which proper safety techniques were discussed; whether the narrow lip of the barge was, factually and technically, a walkway or not; whether any fault lies with Tower Rock for loading barge GD941 as it was; and whether Luhr's practices with respect to the presence of that material constitutes fault. Thus, there are genuine issues of material fact as to the comparative fault to be attributed to various entities.

That said, the facts of this case almost overwhelmingly place the fault on the decedent. The record shows that a worker who could not swim—or could not swim well—went onto a barge in the Mississippi River; chose to step onto a narrow, 12-inch-wide lip that had only a 24-inch wall on one side and dropped off to the Mississippi on the other; and continued to walk down its length despite the obvious presence on it of a powdery substance. The photographs submitted as exhibits in this matter suggest that, regardless of any prior training, regardless of any proper loading techniques, and

regardless of whether the narrow lip of the barge was technically a walkway, it would be foolhardy under the best of circumstances to attempt to navigate that lip on a barge floating on the Mississippi River.  That is particularly true if the person attempting to do so is not a very strong swimmer.

Nevertheless, we are mindful under the summary judgment standard not to overstep the bounds of undisputed facts, and there are still sufficient genuine issues of material fact to preclude summary judgment on the Jones Act negligence and general maritime negligence claims.  We do, however, require the parties to enter into mediation concerning all claims, including these, following our ruling today.

## V.  SPECIFIC CONSEQUENCES: THE MOTIONS

Having discussed the above issues tending to affect more than one motion, we move on to working out the resolution of particular motions.

### A.  Luhr's Motion for Summary Judgment (Doc. 68)

In its motion for summary judgment (Doc. 68), Luhr argues (1) that Carol E. King may not maintain an unseaworthiness claim against it and (2) that Luhr cannot be liable for improperly loading barge GD941 and allowing material to remain in that allegedly dangerous condition.  The magistrate judge's report and recommendation (Doc. 137) correctly finds that under Smith v. Harbor Towing & Fleeting, Inc., 910 F.2d 312 (5th Cir. 1990), Luhr, as non-employer owner of barge GD941, owed no duty of seaworthiness to Mr. King, a Jones Act seaman.  Thus, summary judgment should be granted in Luhr's favor on Ms. King's unseaworthiness claim, and we adopt that part of the report and recommendation.

With respect to the negligence claim, however, we decline to adopt the report and recommendation, inasmuch as it relies on <u>Scindia Steam Nav. Co., Ltd. v. De Los Santos</u>, 451 U.S. 156 (1981), to establish the contours of the duty owed by Luhr to Mr. King. <u>Scindia</u> is limited to LHWCA workers such as stevedores and longshoremen, and we can find no cases applying the <u>Scindia</u> duty in the context of a general maritime negligence claim by a Jones Act seaman.  Because we decline to adopt that part of the report and recommendation applying the <u>Scindia</u> standard, we must analyze the general maritime negligence claim against Luhr under the usual standard.

General maritime negligence claims use the ordinary "due care, i.e., reasonable prudence" standard, <u>Cox v. Esso Shipping Co.</u>, 247 F.2d 629, 637 (5th Cir. 1957), as well as comparative fault, <u>Pope & Talbot v. Hawn</u>, 346 U.S. 406, 408-09 (1953).  Under any standard, Luhr cannot be liable for any improper loading, because it is clear from the record that Luhr did not load the barge—Tower Rock did.[7]  Although Ms. King, through counsel, strenuously argues that Tower Rock and Luhr are related companies and have an overlapping roster of owners, Tower Rock and Luhr remain distinct legal entities and as a general matter cannot be liable for each other's actions.  A claim for improper loading properly would have been brought only against Tower Rock and cannot lie against Luhr, regardless of the negligence standard.

However, Luhr was the owner <u>pro hac vice</u> of barge GD941 and towed it from Missouri to Louisiana before relinquishing control to a VD&S towboat.  As discussed above, genuine issues of material fact remain, <u>inter alia</u>, as to whether Luhr properly left

---

[7]  Plaintiff has brought forth no evidence, beyond mere allegations, that Luhr loaded the barge.

the barge in its condition, whether it was a dangerous condition at all, and whether the narrow lip was <u>technically</u> a walkway.  Because comparative negligence analysis requires us to determine each party's percentage of fault, these genuine issue of material fact preclude summary judgment.

Thus, we adopt the report and recommendation (Doc. 137) in part.  Luhr's motion for summary judgment (Doc. 68) is GRANTED IN PART as to the unseaworthiness claim against Luhr but DENIED IN PART as to the general maritime negligence claim against Luhr.

### B.  Tower Rock Stone's Motion for Summary Judgment (Doc. 103)

In its motion for summary judgment (Doc. 103), Tower Rock argues that the Fed. R. Civ. P. 14(c) tender by Two-J/VD&S in favor of claimant Carol E. King should be dismissed because it was not brought within the three year statute of limitations for Jones Act and general maritime actions.  Tower Rock also argues that the Fed. R. Civ. P. 14(a) indemnity and contribution claim brought by Two-J/VD&S should be dismissed because (1) indemnity is disallowed under <u>Hardy v. Gulf Oil Corporation</u>, 949 F.2d 826 (5th Cir. 1992); and (2) contribution should be disallowed under <u>Simeon v. T. Smith & Son, Inc.</u>, 852 F.2d 1421 (5th Cir. 1988).  Finally, Tower Rock argues that it cannot be liable at all because it breached no duty to anyone regarding the loading of barge GD941.

The magistrate judge's report and recommendation (Doc. 138) correctly determined that the Rule 14(c) tender should be dismissed because it was filed outside of the three year limitation period but determined that the indemnity and contribution

claims should not be dismissed on that ground.[8]  Fed. R. Civ. P. 15(c) is inapplicable to the Rule 14(c) tender, because a Rule 14(c) tender obviously is not an "amendment to a pleading" that would give rise to Rule 15(c)'s relation-back rules.  Thus, we adopt the part of the report and recommendation recommending dismissal of Two-J/VD&S's Rule 14(c) tender of Tower Rock to claimant Carol E. King.

We decline to adopt the part of the report and recommendation concerning the indemnity and contribution claims.  First, with respect to the indemnity claims, we do not believe that the report properly applies Hardy v. Gulf Oil Corporation, 949 F.2d 826 (5th Cir. 1992).  In Hardy, the Fifth Circuit identified "a handful of viable indemnity theories" remaining in the general maritime context—specifically, the following three: (1) "a vicariously liable or non-negligent tortfeasor is entitled to indemnity 'from a co-debtor guilty of actual fault'"; (2) a vessel may recover indemnity from a stevedore for the stevedore's breach of the implied warranty of workmanlike performance under the narrowly construed Ryan doctrine; and (3) a party may seek contractual indemnity. Hardy, 949 F.2d at 833-34 (citations omitted).

Here, Ms. King asserts a Jones Act negligence claim and general maritime negligence claim against VD&S, plus general maritime negligence claims against Luhr. Although Ms. King's claims against Tower Rock are time-barred, some fault may still be

---

[8]  Although the report and recommendation states that Two-J/VD&S filed the Rule 14(a) third party complaint and Rule 14(c) tender on May 4, 2005, it appears that the document filed on that date was deficient and was not properly filed until September 21, 2005.  In any event, it fell outside of the three year limitation period, which began on the date of the accident, November 7, 2001.

attributed to Tower Rock under the comparative fault scheme applicable here.  Thus, there could be some basis for a remaining claimant to seek payment from Tower Rock.

However, Ms. King does not assert that the potentially liable parties—Two-J, VD&S, and Luhr—are only vicariously liable or non-negligent.  Instead, she asserts that all defendants are actually liable.  Thus, the first theory listed in Hardy cannot apply.  Second, this situation obviously does not fit the restricted boundaries of the Ryan doctrine.  Third and finally, no party alleges the existence of contractual indemnity.  Because this situation does not fit one of the viable indemnity theories enumerated in Hardy, Two-J/VD&S's third-party indemnity claim against Tower Rock must be DISMISSED.

The contribution claim is a bit different.  Tower Rock argues that under Simeon v. T. Smith & Son, Inc., 852 F.2d 1421 (5th Cir. 1988), Ms. King's time-barred claim should also preclude a contribution claim.  Specifically, Tower Rock quotes the following passage from Simeon:

> The traditional view is that there can be no contribution between concurrent tort-feasors unless they share a "common legal liability" toward the plaintiff.  F. Harper, F. James, O. Gray, 3 The Law of Torts § 10.2 at 46 (2d ed. 1986); W. Prosser & P. Keeton, supra, § 50 at 339-40.  The contribution action arises from the original obligation that the party cast in contribution owed to the plaintiff.  "If there was never any such liability, as where the contribution defendant has the defense of family immunity, assumption of risk, or the application of an automobile guest statute, or the substitution of workers' compensation for common law liability, then there is no liability for contribution."  W. Prosser & P. Keeton, supra, § 50 at 339-40.  E.g., Restatement (Second) of Torts § 886A, comment g (1979)[.]

Simeon, 852 F.2d at 1434 (some citations omitted).

Tower Rock argues that the running of the limitation period of the claim between Ms. King and Tower Rock falls into the same category as "family immunity, assumption of risk, or the application of an automobile guest statute," as listed in <u>Simeon</u>.  However, that is not necessarily so.  Note that the quote in <u>Simeon</u> cites Restatement (Second) of Torts § 886A, comment g (1979).  The second paragraph of that comment reads in full:

> The statute of limitations may offer some difficulty, since the cause of action for contribution cannot arise until full payment has been made, which may be a great deal later than the original injury. The contribution suit should therefore be made subject to its own statute of limitations, sufficiently short to afford protection against undue extension of the tortfeasor's liability. These questions are for the legislature and not within the scope of this Restatement.

<u>Id.</u>

Comment k to the equivalent section ("Contribution") in the Restatement (Third) of Torts is somewhat clearer:

> <u>k. Statutes of limitation</u>.  Notwithstanding Comment j, a person is not protected from contribution by the fact that the plaintiff would be precluded from recovery because of a statute of limitation.  The limitation period on a claim for contribution and its beginning are governed by the applicable law governing statutes of limitation.

Restatement (Third) of Torts § 23, comment k (2000).

Although the Restatements are, at best, persuasive authority, the Fifth Circuit case on which Tower Rock relies takes its language and its rationale in part from the Restatement (Second) of Torts.  Accordingly, the comments to the Restatements, including the most recent version, assist in interpreting the language.  Absent case law to the contrary (and we can find none), it appears that the time-bar of Ms. King's claim against Tower Rock has no effect on Two-J/VD&S's contribution claim against Tower

28

Rock.   Thus, summary judgment is inappropriate on Two-J/VD&S's Rule 14(a) contribution cross-claim.

In summary, we adopt the magistrate judge's report and recommendation (Doc. 138) in part.  Tower Rock's motion for summary judgment (Doc. 103) is GRANTED IN PART as to the Rule 14(c) tender and as to the Rule 14(a) indemnity claim, but the motion is DENIED IN PART as to the Rule 14(a) contribution claim.

### C.  Two-J and VD&S's Motion for Summary Judgment (Doc. 106)

In their motion for summary judgment (Doc. 106), Two-J and VD&S assert that James King is not a Jones Act seaman; that Carol E. King is not entitled to an action for unseaworthiness against VD&S; and that if James King <u>was</u> a Jones Act seaman, Ms. King is not entitled to recover nonpecuniary damages.  The magistrate judge's report and recommendation (Doc. 139) made no determination as to seaman status; determined that plaintiff's unseaworthiness allegations involved Two-J/VD&S's operation of its own vessels rather than Luhr's barge GD941 and thus could proceed; and made no determination as to nonpecuniary damages because of the unresolved seaman status.

We decline to adopt most of the report and recommendation. First, as explained in detail above, we find as a matter of law that James King was a Jones Act seaman, and the consequences of that determination are evident throughout this ruling.  The motion for summary judgment must be denied on that issue.  Second, we hold, as discussed above, that Carol E. King is entitled only to nonpecuniary damages and may not seek, <u>inter alia</u>, damages for loss of society or punitive damages.  The motion for

summary judgment must be granted on that issue.  Thus, we decline to adopt the parts of the report and recommendation concerning those issues.

However, we adopt the report and recommendation in part with respect to the unseaworthiness claims.  Although it is true, as noted above, that no one, including VD&S, is liable for an unseaworthiness claim relating to barge GD941, it is not clear that Ms. King has failed to state a claim relating to the M/V Carla J, since there appears to be at least a genuine issue of material fact regarding the adequacy of the safety equipment supplied on the M/V Carla J.  White v. Rimrock Tidelands, Inc., 414 F.2d 1336, 1339 (5th Cir. 1969); cf. Wilhelm Seafoods, Inc. v. Moore, 328 F.2d 868 (5th Cir. 1964) (affirming judgment of unseaworthiness based particularly on "the fact that the life ring did not have a rope attached to it, and that the life jackets were not readily available").[9]  However, Ms. King has absolutely failed to state any unseaworthiness claim with respect to VD&S's spud barge, so any such claim must be dismissed.

In short, the report and recommendation (Doc. 139) is adopted in part. The motion for summary judgment (Doc. 106) of Two-J and VD&S is DENIED IN PART on the issues of Jones Act seaman status and the unseaworthiness claim relating to the M/V Carla J. The motion is GRANTED IN PART on the issues of nonpecuniary damages and  the unseaworthiness claim relating to VD&S's spud barge.

---

[9]  We say that there is a genuine issue of material fact, because we properly may not weigh the evidence at this stage.  The weight of evidence suggests, however, that an adequate life preserver was supplied and that it was either not worn or not worn properly.  That in itself suggests that the vessel was not unseaworthiness for failure to supply safety equipment. Out of caution, we give claimant Carol E. King the benefit of the doubt.

### D.  King's Motion to Dismiss Cross-Claims (Doc. 72)

Claimant Carol E. King argues that the cross-claims filed by Luhr and Two-J/VD&S should be dismissed because there is no right to indemnity and attorney's fees under maritime law.  While we agree that there is no right to indemnity or attorney's fees,[10] Ms. King has failed to address the remaining claims—contribution.  Under the reasoning of Simeon v. T. Smith & Son, Inc., 852 F.2d 1421 (5th Cir. 1988), it is evident that both Luhr and Two-J/VD&S could share a "common legal liability" toward Ms. King, Id. at 1434, because each could be liable in negligence for the same underlying tort—wrongful death.  Thus, under Simeon, each would be eligible for a contribution claim against the other, and Ms. King's motion is appropriately denied on that ground.

Ms. King's motion to dismiss the cross-claims of Luhr and Two-J/VD&S (Doc. 72) is GRANTED IN PART as to the indemnity and attorney's fees cross-claims.  The motion is DENIED IN PART as to the contribution claims.

### E.  King's Motion to Lift Stay and to Remand (Doc. 74)

In her motion to lift stay and to remand (Doc. 74), Ms. King essentially argues that claimant LWCC's joining with her in a stipulation is sufficient to satisfy the requirements set out in our March 29, 2006 ruling (Doc. 56) denying her first motion to lift stay and to remand.  That is not so.  In our earlier ruling, we stated:

> The issues, then, are (1) whether the proposed stipulations cover all potential claimants, and (2) whether the proposed stipulations adequately protect the shipowners' rights to limit liability.

---

[10] See our discussion of indemnity in Part V(B), supra.  Under the same rationale, neither Luhr nor Two-J/VD&S has stated a proper indemnity claim under Hardy v. Gulf Oil Corporation, 949 F.2d 826 (5th Cir. 1992).  They point to no source in the law or the record for their attorney's fees claims, and we can find none.  Thus, these claims are properly denied.

(Doc. 56, p. 6).

Here, the proposed stipulations clearly do not cover all the claimants.  As a result of our ruling today, potentially viable cross-claims between Luhr and Two-J/VD&S remain.  Thus, they remain claimants in the case but have not joined in the stipulations.

Moreover, the proposed stipulations do not adequately protect the shipowners' rights to limit liability.  Luhr's vessel, the GD941, has a stipulated value of $182,500, while Two-J/VD&S's vessel, the M/V Carla J, has a stipulated value of $35,000. Although claimants Carol E. King and LWCC stipulate that they will not seek to enforce any judgment against the shipowners in excess of those individual amounts, that stipulation does not take into account the outstanding contribution cross-claims.  If, for instance, each shipowner is cast in judgment for only the stipulated value of its vessel in the remanded action, either shipowner may still pursue its contribution claim against the other, exposing the other to liability in excess of the stipulated value of the vessel. That possibility demonstrates that the proposed stipulations do not adequately protect the shipowners' rights to limit liability.

Because the proposed stipulations do not cover all the potential claimants and do not adequately protect the rights to limit liability of the shipowners, Two-J/VD&S and Luhr, Ms. King's motion to lift stay and to remand (Doc. 74) is, again, DENIED.

## VI.  CONCLUSION

Based on the foregoing, each of the three reports and recommendations (Docs. 137, 138, and 139) is adopted in part, subject to the modifications explained above and set out below:

(a)  The motion for summary judgment (Doc. 68) filed by Luhr Bros., Inc. is DENIED IN PART as to the general maritime negligence claim against Luhr but GRANTED IN PART as to the unseaworthiness claim against Luhr.  Accordingly Carol E. King's unseaworthiness claim against barge GD941 is DISMISSED WITH PREJUDICE.

(b)  The motion for summary judgment (Doc. 103) filed by Tower Rock Stone Co. is DENIED IN PART as to the Rule 14(a) contribution claim, but the motion is GRANTED IN PART as to the Rule 14(c) tender and as to the Rule 14(a) indemnity claim.  Accordingly, both the claim by Carol E. King against Tower Rock Stone Co. raised in the Rule 14(c) tender, and the Rule 14(a) indemnity claim by Two-J Ranch, Inc. and Vidalia Dock & Storage Company against Tower Rock Stone Co. are DISMISSED WITH PREJUDICE.

(c)  The motion for summary judgment (Doc. 106) filed by Two-J Ranch, Inc. and Vidalia Dock & Storage Company is DENIED IN PART on the issues of Jones Act seaman status and the unseaworthiness claim relating to the M/V Carla J.  The motion is GRANTED IN PART on the issues of nonpecuniary damages and the unseaworthiness claim relating to VD&S's spud barge. Accordingly, all nonpecuniary damages sought by Carol E. King, including loss of society and punitive damages, are DISALLOWED, and Carol E. King's unseaworthiness claim relating to the spud barge is DISMISSED WITH PREJUDICE.

(d)  The motion to dismiss cross-claims (Doc. 72) filed by Carol E. King is DENIED.

(e)  The motion to lift stay and to remand (Doc. 74) filed by Carol E. King is DENIED IN PART as to the contribution claims and GRANTED IN PART as to the indemnity and attorney's fees cross-claims. Accordingly, the indemnity and attorney's fees cross-claims between Luhr Bros., Inc. on the one hand and Two-J Ranch, Inc. and Vidalia Dock & Storage Company on the other are DISMISSED WITH PREJUDICE.

Finally, all parties to these consolidated cases are ordered to enter into mediation concerning all claims within forty-five (45) days of this ruling.

SIGNED on this 11 day of February, 2008 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE